Case No. 15-5304 et al. Carpenters Industrial Council et al. Lewis County, a municipal corporation of the State of Washington et al. appellant, v. Sally Jewell et al. Mr. Rutset for the appellants, Ms. Drummond for the appellants, Lewis County et al., and Mr. Gray for the appellees. Thank you. Thank you. Good morning. Good morning. I am pleased to report that I am Mark Rutset, representing the Carpenters Industrial Council plaintiffs, which include a labor union of lumber workers, a county in California, lumber producers, and forest land owners. In the Pacific Coast states, much of the forest land is distributed in a checkerboard of one-mile sections, called sections, which alternate between federal ownership and private ownership. And typically, the distribution is you have a section of federal land that is surrounded on all four sides by private land, and it's next to a section of private land that is surrounded on all four sides by federal land. Usually, the Forest Service or the Interior Department manages the federal land. On pages 91 and 92 of the joint appendix, we describe the checkerboard relationship between one of our plaintiffs, Seneca Jones Timber Company, and the adjoining federal land. Let me ask you, Mr. Rutset, how are the declarations in support of standing in this case different from those brought in Swanson Group that were found lacking? Well, they are completely different because the declarations, the nine that are distinguished between the three original declarations and the nine, what we call the new declarations. Let's talk about the original declarations. Obviously, there's an issue about whether we can look at the nine, but let's just focus on the three original declarations. How were they different from those that were found lacking in Swanson Group? I would say that they are not different in any significant way. So, in that case, if we were not to allow... They're not different? They are different. Well, they're different on the issue presented in the Swanson case, which was economic injury, and the fault was we didn't rule out every other possible cause of injury other than reduction in timber signals. There's also nothing here in this case about ruling out the other causes of timber signals. But on the number of people who lost jobs and the shutdown of the plant, this had specifics that Swanson did not. That is correct. From the Carpenters Industrial Council representative, it has the number of lost jobs. Which was the key fact that Swanson Court pointed to that was missing from the Swanson declaration. In that sense, of course, there is a difference. I was kind of focusing on... I know you're focusing on the other issue. I'll take back my concession to that extent. It was a concession. The new declarations, and I'll talk about that in a minute, do clearly address what the Swanson Court said was missing. We learn from our mistakes, and we try to correct our mistakes. I was the counsel on the Swanson case. So obviously, after the decision, we try to provide the information that the appellate court says we have to have. So that information is in the record. It's particular pages 112 and 113 of the record. We have lots of authority that suggests that that's too late. You're supposed to bring that to your stage of the proceedings. That's what the district court ruled on the newer declaration. The question of showing good cause for filing the declarations is really the key issue. It's because what happened was the government filed their response to the show cause order after we did. And in that, they said you didn't show good cause. Now, before that moment, we didn't have any reason to believe we had to show good cause because we recounted in probably painful detail all the cases going back to the 18th century where parties have submitted declarations in response to the show cause orders without ever in a single case having to show good cause. I was a little bit confused by this because whatever might traditionally attend an order to show cause, if the district court just says after the fact, yeah, I issued something called an order to show cause, I've now done the rich common law history that you all have done, and I realize that I made an error in terminology. What I wanted was briefing. That's what I wanted. Then would we be here? Because it just seems like it's within the district court's discretion at this stage of the case to say, I've already got factual information on standing. You already had a chance to give me affidavits. Yes, we have a new decision, and I want briefing on whether that new decision affects the existing lay of the land. I issued a thing called an order to show cause. I didn't realize that it had all these trappings associated with it. I'm just going to look at briefs. No, we would still be here because in any event, we have the right to request filing of new declarations upon it showing no good cause. And the problem in the district court was that when the government said we didn't have good cause, we tried to show the good cause. We filed a brief that showed the good cause. Your argument for good cause was twofold. One is we got an order to show cause, and therefore there's good cause. And I'm just taking that one out because I'm just saying the district court just says, yeah, I filed it as an order to show cause. That was just wrong. Let's just say by hypothesis. Even giving you the benefit of the doubt on what an order to show cause necessarily entails. My mistake. I phrased it incorrectly. I wanted briefing. Then you had a second argument as to why good cause had to be found, which is that Swanson came down. Yes. Now, so then it all turns on that. Because if it's not true that a district court would not necessarily abuse its discretion by declining the opportunity to file additional factual material in response to an intervening decision, then at that point we're back to having made a mistake in terminology. So you have to win on the notion that Swanson necessarily gave you good cause, and any court would abuse its discretion to decline the opportunity to file additional factual material in response to an intervening decision. Sort of back to that, but with the caveat that the district court actually never addressed the question of good cause. There was a conclusory statement that says you didn't show good cause, but there's no explanation of why we didn't show good cause. So you really can't discern the district court's logic. So what is the good cause here? Good cause. Presented by Swanson. As I read Swanson, it's that your affidavits were inadequate, right, in Swanson. And the suggestion is they're inadequate in this case of summary judgment. So is that good cause to take another bite at the apple? Well, I mean, when judges apply the good cause, the principal thing they look at, I mean, most commonly is is there any prejudice to the defendant of filing something new for the record. The government has never claimed there was any prejudice to them from the new declarations. I mean, it's a kind of a gotcha game here. I'm sure you can perceive that, that we have the information, we submitted it, and the government is saying, well, it's too late, you didn't have good cause. Actually, I'm not quite sure. Maybe I'm missing something. I'm not quite sure I'm perceiving the gotcha nature of it. Because if the district court never had to give you an opportunity to file additional factual material in the first place, the fact that the district court issues something that is construed to give you that opportunity doesn't necessarily create an irrevocable entitlement to a windfall. No, I'm accepting the premise of your question. I'm talking about Swanson as the gotcha for the good cause. Your theory, I think, is Swanson's the gotcha because Swanson changed the law from Malmstead. Yeah, and I mean in Swanson. Which would equally be true in Swanson itself. So it was unfair in Swanson itself, but apparently that was enough. Well, those are my private conversations that I'm not going to have here, obviously. But in this case, we had an opportunity within the litigation to explain why we had standing in a way that we apparently failed to in the Swanson case. So, I mean, why isn't that good cause? That's good cause. There's no prejudice. And this is a helpful question, but even the government obviously thought you had standing. Well, the government thought we had standing because they didn't challenge standing. Exactly. Because they read Malmstead to show, even though they challenged the declarations in Swanson based on Malmstead, they did not challenge the declarations in this case based on Malmstead. Because the declaration in this case is so much more substantial. The original ones are so much more substantial. Presumably, I'm going to ask them about that. You'd have to ask them. It's true that they didn't, and when we challenged the 2008 critical habitat in this court, and the government did not challenge our standing in that case. So, they had a long history of not challenging standing on critical habitat challenges until the Swanson case came along. So, obviously, they thought there's something about the Swanson case that changes things. All right, fine. So, they changed their position. I mean, this is a little bit of a gotcha, maybe not a little bit, but it's a gotcha, too. Because, of course, I know a party can raise jurisdiction at any time, but if you're silent, you don't challenge it, you wait until the briefing is over, and then say, oh, by the way, you don't have jurisdiction, well, then you lose the chance to respond in the summary judgment briefing and to supplement the record at a time when you haven't. If this case was already up on appeal at the time the Swanson came down, would we have been obligated to remand to give you a chance to supplement the factual record because Swanson comes along and supposedly a brand new law that affects the case? I'm not going to say you'd be obligated, but I think we would have the right to ask you to do that. Of course, definitely we'd have the right to ask. And the question would be would we have the right to say no. And it sounds like any time a decision comes along that a party would like to have an opportunity to address the factual material, that necessarily gives rise to good cause. I don't know that it necessarily gives rise to good cause, but in this case the government thought that the Swanson case changed the landscape and they reversed themselves on our standing. So why isn't it fair that we have an opportunity to respond to the government's new position by presenting new information to answer their belated but legal challenge to jurisdiction? I think there's no doubt that you should have an opportunity to address the government's legal arguments. I think the question is whether you necessarily have an entitlement to submit additional factual material when summary judgment had already been handed down.  Well, let me talk about the wildfire standing issue because that is presented in the original three declarations in the declaration from Siskiyou County. And the first thing is that the district court, not clear what standard the district court applied, but the proper standard for standing for adjacent landowners is the so-called geographical nexus standard, which only requires that the neighbor who is suing show that there is a demonstrable risk of injury or a demonstrable increase in the risk of injury. In this instance, the demonstration of the risk of injury is not only in the record from fires that occurred and damaged property of two of the companies involved in the case, but we have Congress having enacted a statute, the Healthy Forest Restoration Act, in 2003. We actually this year have President Obama signing an executive order recognizing the destructive force of wildfire on adjacent property. We have the Ninth Circuit back in 1994 recognizing demonstrable risk of wildfire, and exactly this situation is indistinguishable. So there is a demonstrable risk, for sure, of wildfires spreading to adjacent property. And taking 3 million acres of land. Unless my colleagues have further questions, we'll give you some time back on rebuttal. Here from the government. I'm sorry, here from the intermedia. Excuse me. May it please the Court. Good morning. I'm Susan Drummond. I represent the counties of Skamania, Lewis, and Klickitat in Washington State. The counties joined Carpenters in requesting that this cart find that both outstanding. Roughly one-third of Washington's nearly 3 million acres of spotted owl critical habitat is located within the counties, with nearly 20% of Lewis County designated and nearly half of Skamania County designated. The counties challenged the rule because the rule did not address the true cause of spotted owl decline. Forests are not the limiting factor. Yet the rule focuses on that rather than the primary culprit, the barred owl. U.S. Fish and Wildlife used computer models to manipulate barred owl presence to create habitat which exists in cyberspace, but it doesn't exist on the ground. As a result, over 800,000 acres of spotted owl habitat was designated within the three counties based upon a fiction. And the harm to you is? There are a wide range of injuries that are affecting the counties. They include economic interests. They include their regulatory interests. The counties, for example. Can you spell out the economic interests? Well, there's a long background with regard to the spotted owl in terms of nearly three decades of trying to manage that species. The rule adds on to that. So the counties are particularly vulnerable to begin with, but the rule as a practical matter is a threat to the well-being, the economic well-being, to the county's tax base, to their employment base. And it adds on to the harms that they're already suffering economically. Because particularly with regard to Escamilla County, where you have nearly half the land base or over half a million acres designated within the county, it has an enormous impact on the logging that occurs within the counties and also there were arguments earlier from Mr. Rutzig on the wildfire issue. The counties have a very strong environmental interest in protecting their forest lands as well as the spotted owl. They're required under the State Growth Management Act to adopt regulations to protect both their forests and the spotted owl. They have both of those in place. And so the counties have environmental interests as well as economic in their forests and in managing those forests. And with the co-mingling of the lands and the county's adjacent lands that are adjacent to those forests, there are particular issues for both the counties and private landowners. And our declarations address the amount of acreage that is adjacent to those forest lands and that presents a real issue for the counties. And there are particularly vulnerable, there are a number of facts addressed in the declarations regarding wildfire risk within southwest Washington. And also with regard to the spotted owl, the counties in adopting the regulations are required to use the best available science as well. So the rule is an impediment to recovering both the spotted owl and recovering the forest. I see that I've got 10 seconds left. No, you don't. I would briefly want to point the court to funds. Your time actually is up. Oh, it is. Apologies. Thank you very much. Thank you, Your Honor. Thank you. May it please the Court, my name is Michael Gray. I'm here on behalf of the Fish and Wildlife Service. The problem with the original declarations and the new declarations is that they are all conclusory in nature when they come to a ledging. Why did you challenge them? The trial attorneys have to make judgments in each case about what they're going to challenge, what they're not, based on their judgment as to what's likely to be the most successful here. And they made the judgment that this would not be successful. They made the judgment that there were better grounds on which to defend the suit at that time. Really, they threw away a jurisdictional... Well, of course the court was still under an obligation to consider... I understand that. They threw away their own opportunity to advance a ground that would have... I wouldn't say that they threw it away. They could raise it later, as they did. And, you know, a case like Swanson Group can have a clarifying effect on how you see the facts in your case, even if it doesn't change the law. Well, let's talk about Mountain States because Mountain States, the declaration, is bare bones. It's right here. It's bare bones. There's one paragraph that's really relevant. And it's got virtually nothing in it. The only really distinction that Swanson seizes on is that it specifies that there was going to be a temporary closing of the mall and a permanent layoff of the 25 workers. And Swanson seizes on that as the distinction. Now, I think what happened is, based on Mountain States, you all did challenge in the district court the Swanson declarations. Yes. Because it didn't have that kind of detail. You did not challenge the declarations in this case, the Parton Declaration in particular. Because the Parton Declaration, if you stack it up next to this Mountain States declaration, it's not even close. It's got all sorts of detail about specific harms. And it does specify, and this is the key in distinguishing Swanson, it does specify particular layoffs at Rough and Ready, that Rough and Ready was going to have to close, and it specifies the number of employees affected in paragraph 10. So that's why, I mean, you can tell me if this is wrong. That's why your attorneys, who I think are very good, said, we don't have a case to raise a standing challenge under Mountain States. I don't want to speculate about exactly what those attorneys thought at the time they did it. But let me show you why this is different from Mountain States and why these declarations are not good enough, even under Mountain States. Mountain States, of course, involved a particular project. Right. There was a sale where the forest had to choose between alternatives. One alternative involved cutting more timber. One alternative involved cutting less timber. And they sued, and they said, we need the alternative with more timber. Here, the problem with these declarations is that they are conclusory when they allege that the critical habitat designation will inevitably result in fewer timber sales. And where did the Mountain States declaration say something like that? Well, they were dealing with a particular project. They said, what the court said in Mountain States is, if you go with the alternative that was selected, there are fewer trees cut. If you go with the alternative that they are suing to enforce, there are more trees cut. So it was because it was a specific project, the declarations there were good enough. Here, it's true that they have information about the number of employees, but the impacts that they all relate to, they say it started in 1990 when the owl was listed as threatened, and there's been a reduction over time. And then only at the very end do they say the critical habitat designation will lead to further reduction. And that's not good enough, because in the final rule, the critical habitat rule, it says right up front, this rule does not take any action or prescribe any policy or plan or program for active timber management, active forest management. It says we designate it's all federal land. There's no private land. There's no state land. Will the critical habitat designation eliminate any sources of supply for these timber manufacturers? They have not alleged that it will. Can you just answer my question? No, I do not believe that it will, because what the critical habitat designation does, I mean, it says it right in there. If you look at the final rule, it says they did what's called the final economic analysis, and it's described in the rule, and it's also- Do you think they'll get your answer no, or is it that it's not necessary? In other words, do you know for sure that it never will? Or is your response more that we don't know yet, and that's the problem? Right. There may be, I mean, I guess it is conceivable that there would be a particular project where consultation would result in the dropping of units or whatever, but the rule itself doesn't do that. That's a bit of an understatement, isn't it? I mean, not to try a witticism here, aren't we missing the forest or the trees here? Is there any serious doubt that this listing has had a significant economic impact, and is there any reason to think it won't have a further impact? The listing of the species, I think there probably is not much doubt that that's had an impact. But the critical habitat designation, which is all that's issued here, they did a final economic analysis that's in the record. That does indicate some effect. What it says is that we've modeled three scenarios. One is no effect. Everything will stay just as it is. One is there may be some detrimental effect, and one is the resource agencies may actually increase, because one of the things you want to do when you're managing habitat is reduce the risk of fire, and so they may actually increase the number of thinning projects to reduce it. And it says we can't say for certain which one of those is true, because that relies on the discretion of the land management agencies here. And, of course, that's the critical point here. What does critical habitat designation do? It requires... As distinct from listing the species. Just explain it to me what it does. Yeah, if there were an area that is designated critical habitat and is unoccupied by the species, for example, which is where you would see the most impact from the designation itself, and there was a project to go forward, then they would have to consult with the Fish and Wildlife Service on whether that project would destroy or adversely modify the critical habitat. And what the courts have said here, we're talking about 9.5 million acres. What does that mean? Can the Fish and Wildlife Service put a stop on a project? I don't think the Fish and Wildlife Service can put a stop on a project necessarily. They would do a biological opinion that would say, we think this is going to result in adverse modification of the habitat, but it's up to the land management agencies to comply with the Endangered Species Act. And so the way this would work is in an area like this, you're unlikely to see much in the way of adverse modification because the area of critical habitat is so large, and because you need to have active forest management in order to reduce the risk of wildfire and disease to keep the habitat healthy for the owl. So your distinction amounts based on the proposition that in that situation there was a specific project at hand. So is your view that when a critical habitat designation is made, it's not to the exclusion of the possibility of standing when a particular project comes up and BLM takes a decision based on what sounds like a recommendation from the service about the spotted owl. There's just too early now. That's exactly right. They're conceding their standing when they challenge a specific project. They still have to meet all the elements of the standing doctrine, and they're going to have to plead. You're promising something that you're going to resist in the next case. I'm pretty confident. Well, they'll have to. I do think that they would be able to plead a case in which they would have standing where if you have a company that, say, is going to bid on a sale, the sale is in critical habitat. They consult with the agency, and the agency says, we're going to drop these four units and reduce the total amount of timber because this would be better for the species, and the land management agency goes with that. And they can say, because of that, we're going to make less money and our employees won't be hurt. But I think they're going to have to make all of those links. But aren't they saying that? I mean, they're saying that kind of writ large are a number of places that are supplied. So I'm going to start with Mountain State says, government acts constricting a firm's supply of its main raw material clearly inflict the constitutionally necessary injury. Here we have with five different companies, them all alleging these areas within the designation are the places where we get the raw material. And it's just our standing law. So I'm sympathetic to you in one key respect. Our standing law is a mess, and I've said that before. This is common sense, which is if you're a company and you're getting your raw material from a place, and the government says you can no longer get the raw material from that place, that's got to be an injury. Now, it may be a lawful decision. I'm with you all the way on that except for the proposition that here the government said you can no longer get your timber from that place. That's what's missing. That's what's missing in this case is they just say it's inevitable. You designate a critical habitat, we're going to get less. But the economic analysis said that that wasn't true. But this is where common sense, as you're probably aware, I've said we shouldn't check our common sense in standing cases. You look at the hollowed out communities all over the Northwest, the rural communities that are described in the declaration, because people have lost their jobs because of these designate. And that may be entirely lawful and proper, but the idea that people haven't been injured? I think common sense would have said that the plaintiffs in the Clapper case in the Supreme Court were going to talk to some of their clients and have the communications intercepted. But the court said it's too speculative. It doesn't matter that it's hard to prove. But it's not certainly impending. You quote that, and there's the key footnote in Clapper, which talks about substantial likelihood. So it's a probabilistic, and this is key. It's not a certainty. It's a probabilistic evaluation. How do we do this is another question. But anyway, the probabilistic evaluation, that's where you are. When you take away someone's supply, and you say all the hollowed-out communities in the rural areas of these Northwest states. And I might agree with you at the motion-to-dismiss stage in this case, because the general allegation is presumed to include the specific facts. But when you get to summary judgment, you have to plead it. I mean, the case can't be more clear at this point. If you're a plaintiff in 2016, you have to plead. It's really not a pleading thing, though, that I think you're describing. What you're describing is that there's no way to plead it. No, I'm not saying there's no way. I'm saying they need to have a particular project that has a particular effect, and the only ones they identify here post-date the complaint. Can I ask this question? They don't post-date the amended complaint. There is one of the three, and it's an open question, I think. You don't look at the amended complaint? This Court has said, you know, the phrase this Court has used is that you look at when the complaint was first filed. The Supreme Court and this Court haven't resolved yet. I think it would have been much cleaner. Can you explain a rationale by which we would not look at the amended complaint for purposes of what you're describing? If the idea is to keep plaintiffs from bringing speculative claims before their right, then you would want to look. Otherwise, you bring a suit, you file your complaint, and then you say, well, we'll figure out our standing later and we'll just amend. I mean, that's the best rationale. Also, I think, you know, had they sought to supplement here with other facts. Whether you can amend a complaint. Once you've amended a complaint, it's difficult to say that that's not the relevant instrument. Can I just ask you this question, which is that, you know, whatever we might think about the way standing should be done in the abstract, we have to deal with Swanson. And on Swanson. And Mountain States. And Mountain States, definitely. And Swanson does deal with Mountain States, of course. So we're dealing with the corpus of that. Yeah, absolutely. So Swanson has, and on the part where it talks about Mountain States, is on the injury problem. Swanson also talks about causation and regressibility separately. And the focus of your argument so far has been, I think, on injury. And as to causation and regressibility, which were both found lacking in Swanson, for better or for worse, it just, one thing that seems different about this case is that here, at least in Swanson, the entity that was being hailed into court was the entity that actually was restricting the timber sales. Because it was the BLM. Right. Here you're one step removed from that. Now, I think there's a lot of common sense to the proposition that this is having a practical effect, and we can discern that. I'm just trying to marry it with Swanson in the situation in which, in certain cases of that case, the court found no causation or regressibility, even though, apart from injury, even though we were talking about the entity that. There is a significant problem here with relying on the actions of the third parties. I think, of course, if you remove the critical habitat designation, then there's no guarantee at that point that. Most of their declarations say we want an increase from the current level, and there's no guarantee that removing the critical habitat designation would lead the BLM or Forest Service to increase the baseline timber production or what they've already done. You just said no guarantee. And I understand why you said it, but that's not the standard. The standard's a probabilistic standard. Well, but they have to show it's a probabilistic standard, but they have to show some evidence. The evidence is that. They're not, I mean, there's a third party, and the cases are replete with saying that if you're relying on the actions of a third party, especially an agency that has wide discretion, then that breaks that chain. I have two things about causation. On causation, Swanson linked back to the injury. Without information about Rough and Ready's past injury, Felipe's declaration does not show that the economic losses fairly can be traced. So it links back to the failure, and this is how it distinguishes Mountain States, the failure to talk about specific numbers because Mountain States, again, with this declaration, had specific numbers, and here we have specific numbers with Rough and Ready. Again, but the specific numbers go to injuries they suffered, not a result of the critical habitat designation. And I think that's the key point here is that the specific numbers they provide all go to injuries they suffered for some other reason, and they say, we think the critical habitat designation is going to contribute further to it. But there's no showing as to why that is so, why the final economic analysis said it could be any one of three results. It may turn out that the land management agency's injuries. I'm looking at page 72028, and there's a paragraph that says, we find that incremental economic impacts to U.S. FS timber harvest are relatively more likely in unoccupied major clans or approximately 1.1 million acres of 2.6 million timber. If you continue, it says incremental impacts are more likely, and if you continue reading the full section, what it says is there's three possible outcomes. One is no impact because they'll say the same. One is that there will be some negative impacts, and one is that there will be positive impacts because the land management agencies will increase timber. And then it says these agencies have discretion, and we can't say which one of those is more likely. They're here saying, well, it's going to be decreased, but they don't prove it. They don't have any specific facts to prove it. Maybe I'm misreading the sentence. We estimate that incremental – this is a different sentence. We estimate that incremental economic impacts due to the critical habitat designation would be relatively more likely to occur in unoccupied areas. Yeah, but the difference is it's saying incremental impacts, but it doesn't say whether those impacts are positive or negative in that sentence. And if you read the full thing, it says there's a range of outcomes. We think there will be some impacts, but we don't know whether they'll be positive or negative. They've just asserted it'll be negative, but the final economic analysis says that – How can it be positive for these companies? Because if the land – so, for example, if the Forest Service were to conclude that in order to protect the critical habitat, it's necessary for the critical habitat to go in and do more thinning where they haven't done it before, that would increase the number of sales and make more timber available. And the economic analysis goes through that and says this is one possible outcome. And it actually quantifies it, and it's a – I think it was on the range of $2 million or something, potential positive outcome. And then it says we don't know because it depends on the discretion of the land management agencies. We don't know if that's going to happen or if it's going to be a negative impact. They have to show something that shows there is an actual negative impact from this in that situation. I think it would be a much different case if the final economic analysis had said this is definitely going to be a detriment, a negative impact, but we don't care because the critical habitat's imported. One of the things I'm trying to do is, as you can tell, square Mountain States and Swanson trying to figure out where the sweet spot is there. And I know you're familiar with that. In Mountain States, the court said, the plaintiffs may not have any particular right to federal timber contracts, but no such right is required any more than a right to view crocodiles for the plaintiffs in Lujan. Yeah, we have not challenged the notion that – I mean, I think it goes even further. The courts have said that the right to bid on a benefit can be an injury. And I don't think that's the problem. The problem is that they've not shown any specific evidence or any particular project where they've been injured in this case. And here's another sentence, the last one I'll read from Mountain States, just to get your reaction because that's helpful. Thank you. Given the company's historic dependence on the upper yak for its supply, together with the disruptive effect of the past shutdown, logging cutbacks in the upper yak clearly inflict injury on the firm's economic well-being, which in order reducing the cutbacks would redress. And again, the key there is logging cutbacks. And what's missing from these declarations is any specific evidence that there will be a reduction in logging. That's what's missing. That's the problem. You really think there's doubt about that? The final economic analysis, which is in the record and conducted, you know, a robust economic analysis conducted for exactly this purpose, says there's doubt. So, yeah, I'm comfortable saying that there's some doubt. So you're just seeing ghosts? And if there's not doubt, if there's not doubt and there's a particular project, then they can bring a suit at that time and plead it in the way that I've talked about. So it's more a rightness thing. I mean, I realize standing and rightness overlap, but it's not that they— It's that the allegations here aren't quite concrete enough yet. There's not the impending imminent injury. Let me just explore this because I'm sure we'll be back here in two years. But if they have a specific place that they say is no longer available and we would have gotten timber from there, gotten raw materials from there, is that good enough? I think that that's—I think that that's— If they say we're a company that operates in this place, this place has been removed completely, and it was removed completely because of the critical habitat designation, and that's going to cause us economic injury, I think that's probably good enough. But they haven't done it. So you're saying it's not just a pleading problem now. You're saying there's actually no way under the facts that we have now that they could plead in such a way to have standing because no decisions have been made that are going to harm them economically? I think under these facts, that's right. Again, I think it would be a different case if the economic analysis did say, or you had some actual specific facts that said this will happen. So, for example— And that's where the history— The declaration that you referred to earlier, I think it's the Sanders declaration, which talks about a couple of specific projects. That's getting close. They are right. Of course, there's post-date, except for the one on the amended complaint. The one's all they need. Well, if, in fact, you do look at the amended complaint, which hasn't been settled, but even as to that one, I'm not sure that the allegations as to that particular project are as concrete as some of the others in there. But if they had come in and said, these are projects where we're losing timber, and we expect that that will continue with other projects, that's much closer. But the other problem, of course, with Sanders is you have the Rule 6 issue where that was not properly in front of the court. If it's a pleading thing, I think I disagree with you, because the pleadings, the affidavits are replete with what you just said. I don't think that that's how it is. But your point is that they're pleading affidavits. Well, I think your point is that— That Sanders affidavit is the best one that they have. But, of course, that was excluded by the district court because it wasn't timely filed. Let me— Well, I guess we— Can I ask a question or two about that? So on the good cause, why isn't it good cause that a new decision came down from this court that changed the law? Well, I think we would disagree that it changed the law. As I said at the beginning of this, I think it clarified how you look at the facts of these things. But the reason I challenge you on that in going back to is, obviously, it changed the law from your guy's perspective. Well, I don't think that that's—I think you may be— You guys are not hesitant to impose standing objections, as you're well aware, and you didn't in this case. It's the first item on the checklist. Based on the last case, you don't always interpose sovereign immunity objections. Now you're barely aware, Kyle. Things sometimes get missed or not fully appreciated at the time. It's the same—I understand you're in a tough position here, but let me just play out my position and you can shake your head no. It's a tough—you say you're making decisions. It's the same basic kind of case about the same basic area for the same basic issue with at least one, I checked, of the same lawyers for you guys involved. And yet in one case, you don't—you raise the standing pretty aggressively, Swanson, I think because it lacked the detail that even Mountain State's bears it was had. In the other case, you've got the part of that question. The sequence of events may be also important here in understanding how you can come to that judgment where, of course, they had lost the standing argument in the district court in Swanson and were in front of the same judge. So I don't know if you're making a judgment on how best to use your limited space in responding to a summary judgment motion. That's necessarily a place you want to go, knowing that you can—if Swanson is successful in appeal, you'll be able to— But I think they—I mean, the timing, the chronology as I look at it, you all challenged standing in Swanson. Their complaint is filed later in this case, and they probably learn, just speculating, from your objections to the complaint in Swanson. So they beef up the declarations here with the Parton Declaration and the other ones, which are much more robust. Your lawyers look at it and say, well, how can I object to that? Well, we didn't win Swanson in the district court, and so— So maybe that's— That's a good answer. So now maybe we're not going to go up against the same judge with the same argument at this point. So that's a fair point, but what about the good cause then? Assume it's a change as opposed to a clarification. Is that—is a change— I think if the—if what had happened here was they had come in and they had filed a motion and said, we want an extension of time on our declarations because there's been a change and we want an opportunity to address it, and if the district court had said, okay, I see that there's been a change and I'm going to allow you to address it, I do not think the United States would be here on an affirmative appeal arguing that was an abuse of discretion. But what actually happened was exactly what happened in National Wildlife Federation. They just simply attached the new declarations to what they filed without filing a motion and without seeking leave of the court. And I think it was within the court's discretion under National Wildlife Federation at that point to say, no, it's too late. Do you think it was crazy not to read the show cause order as allowing them to submit new affidavits? I'm not going to say it's crazy, but I think it was probably wrong. I mean, you know, take any—if, for example, an appellant in this court failed to file a brief and the court issued a show cause order why the case shouldn't be dismissed for lack of prosecution, you wouldn't have just come in and filed your brief. You'd file a motion for leave to file the brief at a time. And I think this is not—you know, what the district court did was not the typical show cause process. It was—you know, the sequence of events was they had their opportunity to prove it. You know, they had the opportunity to provide declarations. Well, we do issue show cause orders, and I'm just going on memory here for things like standing or jurisdictional issues, and we'll often get, I think, back argumentation plus affidavits. But that's, you know, kind of standard practice. Well, in this court, you know, of course you're not—Rule 6 is not— Yeah, no, it's different. Rule 56 says you file affidavits in support of a motion at the time the motion is filed. And Rule 6 says if you don't do that, you have to seek leave of the court and show your good cause. And where they don't seek leave, if nothing else, National Wildlife Federation says the district court's not obligated at that point to accept it. And this court even has a case, which I'm blanking on the name of right now, where it said if there's no motion filed, there's no discretion to exercise. And in that case, the court had let it in, let the additional documents in, and this court said no, that's an abuse of discretion because no motion was filed. And here he does the show cause order. They come in with the briefing of the submissions, including the new affidavits. You all object, and then they submit a reply that says here's why we have good cause. And the district court says I'm not going to consider that. Again, because of the sequence of events. I have some mild desire not to make the litigation process a hall of mirrors. I understand. Thank you. Unless there's further? Mr. Resnick, we'll give you back a couple minutes. Thank you very much. I have a few points to make. The independent case, the Supreme Court said that Fish and Wildlife Service biological opinions are determinative on the action agency. So when the Fish and Wildlife Service says you shouldn't do X, they really can't do X. Could you address the point about the economic analysis, which suggests that we don't know that there will be economic harm? Well, let me say two things. First, we don't need an admission from the government to establish our stance. Sure, it would be great if they said, yes, there's going to be economic injury. They didn't say that. We don't need that. We pointed to nine quotes from the record, which contain the information that says that the most cutting one, that's bad fun, the most relevant one is they said, we will not allow traditional timber cutting or timber harvest in the critical habitat. Well, look, they don't mean they're going to allow more cutting. They mean they're going to allow less cutting. And they go through over and over again, you should stop doing what you were doing and go with the ecological approach. Well, that doesn't mean more cutting either. That means less cutting. Over and over again, they said that. No one ever responded to our citation of these points. The government did not in its briefs. District Court did not. Never addressed what was in the record. All right. Next point, there is no project to challenge in the future. That is a figment of the government's imagination. What actually happens is the agency never proposes a timber sale in critical habitat because they know what's going to happen. There's nothing to challenge. The project, the mythical project, does not exist. That is the reality of the situation. When they meet, when Fish and Wildlife meets with the BLM of the Forest Service, by the way, they meet in secret. There are no notes kept. The public has no idea what they say. And then something happens. So we couldn't challenge it even if we wanted to challenge it. And there's really no final agency action to challenge. Okay. The adverse modification standard that is applicable to critical habitat is tied to the recovery of the species, not to jeopardy, not preventing extinction, but actually recovering. It is a very strict standard. And now the agencies cannot adversely modify 3 million acres of the 4 million acres that they were supposed to conduct timber harvest on. So 75% of where the timber was supposed to come from is now subject to the adverse modification standard, which cannot mean more cutting. It can only mean less cutting. Maybe not a complete prohibition, but clearly there's a high likelihood of less cutting, no likelihood of more cutting. All right. Finally, back to Mountain State, it did not involve a particular project. It involved a plan for a 400,000 acre section of the National Forest in Montana. And it is therefore really, it can't be distinguished as involving a project. So that is just not true. Especially the district court decision actually explains most clearly what it was that they were challenging. All right. That is it. Okay. Thank you very much. Case is submitted. Oh, I'm sorry, Ms. Drummond, we'll give you a minute if you'd like it, but don't feel the need to. A brief minute is 60 seconds. All right. Thank you, Your Honor. Bear that in mind. Just one point I wanted to make, and this is clear in the briefing, but the counties did establish standing when they intervened, and it was never questioned at any point up until the Show Clause order. Also, there are a number of cases. I mean, the county's standing is consistent with, for example, Funds for Animals v. Norton, where China's natural, or the sheep there was a natural resource. Here we have the forest, which are the county's natural resources, but also pointed the court to Cape Hatteras County of San Miguel v. McDonald with very similar analysis. And, of course, if the Swimmer and Friends of the Earth v. Laidlaw have standing, and if the individuals with an appreciation for a battlefield site have standing, then certainly the counties with nearly 20% and up to 50% of their land base designated certainly have standing. Thank you, Your Honors. Thank you very much. Now the case is submitted.
judges: Griffith, Kavanaugh, Srinivasan